**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ORTIZ and JAVIER HERNANDEZ, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>FORIS DAX, INC.,<br><br>                              Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; and UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................3

THE PARTIES.........................................................................................................................4

JURISDICTION AND VENUE ...............................................................................................5

TOLLING AND RELATED ARBITRATION PROCEEDINGS............................................5

SUBSTANTIVE ALLEGATIONS .........................................................................................7

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers. ......................................................................................................7

    B.    Defendant Falsely Informed Users That They Could Disable the Website's Use of All Cookies. .............................................................................................................13

    C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website. .................................................18

        1.    The Website Causes the Interception of the Contents of Communications ..................................................................................................................18

        2.    Facebook Cookies ........................................................................................18

        3.    Google Cookies............................................................................................23

        4.    Twitter Cookies ...........................................................................................29

        5.    Snapchat Cookies.........................................................................................32

    D.    The Private Communications Collected are Valuable. ..........................................36

PLAINTIFFS' EXPERIENCES .............................................................................................37

CLASS ALLEGATIONS .......................................................................................................43

CAUSES OF ACTION ...........................................................................................................45

    First Cause of Action: Invasion of Privacy.........................................................................45

    Second Cause of Action: Intrusion Upon Seclusion...........................................................47

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)..................................................................................49

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ......................................................................54

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation................55

    Sixth Cause of Action: Unjust Enrichment.........................................................................58

CLASS ACTION COMPLAINT

Plaintiffs Jose Ortiz and Javier Hernandez ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Foris DAX, Inc. ("Defendant" or "Foris Dax"). Plaintiffs' allegations against Defendant are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon each Plaintiffs' personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.crypto.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Disable All" cookies, as shown in the following screenshot, which is stretched to enhance readability:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. However, unlike other websites, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But Defendant's promises are outright lies, designed to lull users into a false sense of security. Even after users elect to "Disable All" cookies, Defendant surreptitiously causes several third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick and Google Analytics), X Corp. (Twitter), and Snap Inc. (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

CLASS ACTION COMPLAINT

3.      Contrary to their express declination of cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Disable All" button on the Website's cookie consent banner sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

**THE PARTIES**

6.      Plaintiff Jose Ortiz ("Plaintiff Ortiz") is, and was at all relevant times, an individual and resident of Daly City, California. Plaintiff Ortiz intends to remain in California and makes his permanent home there.

7.     Plaintiff Javier Hernandez ("Plaintiff Hernandez") is, and was at all relevant times, an individual and resident of North Hollywood, California. Plaintiff Hernandez intends to remain in California and makes his permanent home there.

8.     Defendant Foris DAX, Inc. is a Delaware corporation with its headquarters and principal place of business in Tyler, Texas.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

10.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.     Further, the Private Communications and data which Defendant causes to be transmitted to Third Parties are routed through servers located in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

14.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that even though they declined all cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until on or around February 4, 2024 (Hernandez) and September 25, 2025 (Ortiz) when they learned of Defendant's privacy

CLASS ACTION COMPLAINT

violations from their counsel. As alleged below, Plaintiffs do not have the expertise to test whether the Website honored users' requests to disable all cookies.

15.     On or about February 21, 2024, Plaintiff Hernandez notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear declination of such third-party cookies. Plaintiff Hernandez further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

16.     The Website's Terms and Conditions contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before the American Arbitration Association ("AAA").

17.     Accordingly, on July 17, 2024, Plaintiff Hernandez filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. Plaintiff Hernandez asserted claims in the arbitration arising from the same conduct alleged herein.

18.     Arbitrator James Grossman was assigned as the arbitrator.

19.     Following an initial conference on May 8, 2025, the Arbitrator ordered briefing regarding arbitrability of the underlying dispute.

20.     On August 25, 2025, Arbitrator Grossman found that Plaintiff Hernandez had waived his right to challenge arbitrability. On September 8, 2025, counsel for Plaintiff Hernandez requested reconsideration of Plaintiff Hernandez's motion following the Court's decision in *Pemberton v. Restaurant Brands International, Inc., et al*, No. 3:25-cv-03647 (N.D. Cal. Sept. 5, 2025).

21.     On September 9, 2025, the AAA informed the parties that Arbitrator Grossman had recused himself from the matter.

22.     On September 24, 2025, the AAA issued a closing letter following Defendant's failure to pay required fees. *See* Ex. B.

23.    Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs from discovering their claims sooner. Further, Plaintiff Hernandez's claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff Hernandez's claims since his claims were substantially similar in the demand letter and arbitration proceeding to those asserted in this Complaint. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Hernandez's pursuit of his claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Hernandez to pursue his claims in this forum. Plaintiff Hernandez acted in good faith and engaged in reasonable conduct in filing his Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.**

24.    Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

25.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within

that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

26.     As a result, Defendant knew that the devices used by Plaintiffs and Class members to access the Website were located in California.

27.     Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

28.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

29.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

30.     A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; www.google.com; analytics.twitter.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier

that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

31.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

32.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

33.    Defendant's Websites serves as a marketing platform for Defendant's cryptocurrency exchange and related financial services. Visitors can, among other things, download Defendant's cryptocurrency trading application, view current cryptocurrency prices, browse listings of non-fungible tokens (NFTs), and access educational or promotional resources related to cryptocurrency trading and investment. The Website is structured to promote Defendant's products and services and to encourage visitors to create an account in order to participate in cryptocurrency trading, financial rewards programs, and other offerings using Defendant's trading platform. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private

CLASS ACTION COMPLAINT

Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

34.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

35.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> **Automated technologies or interactions.** As you interact with us via our Site, we will automatically collect Technical Data about your equipment, browsing actions, activity, and patterns. We collect this data by using cookies, server logs, and other similar technologies. We will also collect Transactional Data, Investment Data and Usage Data. We may also receive Technical Data and Marketing and Communications Data about you if you visit other websites employing our cookies. You may find more information about how we use cookies and make adjustments to certain preferences through the Cookie Preferences section available on the Site.[1]

---

[1] Crypto.com U.S. Privacy Policy (updated 10/31/2023) (currently available at https://crypto.com/privacy/en/usa) (the "Privacy Policy"). Defendant has subsequently updated its Privacy Policy but, based on information and belief, this version was in effect at the time Plaintiffs chose to disable all cookies on the Website.

CLASS ACTION COMPLAINT

1    36.    As explained in more detail below, Website users who clicked the "Customize
2  Settings" button in the banner were presented with Defendant's Privacy Preferences Center
3  window. Defendant explained the categories of third-party cookies it used on the Website as
4  follows in its Privacy Preference Center:

## Manage Consent Preferences    ✕

**Strictly Necessary Cookies**    **Always Active**

These cookies are necessary for the website to function and cannot be
switched off in our systems. They are usually only set in response to actions
made by you which amount to a request for services, such as setting your
privacy preferences, logging in or filling in forms. You can set your browser to
block or alert you about these cookies, but some parts of the site will not
then work. These cookies do not store any personally identifiable
information.

Cookies Details

**Performance Cookies**    

These cookies allow us to count visits and traffic sources so we can measure
and improve the performance of our site. They help us to know which pages
are the most and least popular and see how visitors move around the site. All
information these cookies collect is aggregated and therefore anonymous. If
you do not allow these cookies we will not know when you have visited our
site, and will not be able to monitor its performance.

Cookies Details

**Functional Cookies**    

These cookies enable the website to provide enhanced functionality and
personalization. They may be set by us or by third-party providers whose
services we have added to our pages. If you do not allow these cookies then
some or all of these services may not function properly.

Cookies Details

CLASS ACTION COMPLAINT

Under the Cookies Details link, Defendant specifically identified Google cookies (doubleclick.net and google.com), X/Twitter cookies (t.co and twitter.com) and Snapchat (snapchat.com) cookies as among those "Targeting Cookies" that users could choose to disable or otherwise reject.

**B.    Defendant Falsely Informed Users That They Could Disable the Website's Use of All Cookies.**

37.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "We use cookies on our website to operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics." The banner then purported to provide users the opportunity, rather than choosing to "Accept All"

CLASS ACTION COMPLAINT

cookies for these and other purposes, to instead "Disable All" cookies, as shown in the following screenshot from the Website, which has been stretched to enhance readability:



38.     Plaintiffs and other Website users who clicked or selected the "Disable All" cookies button, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.[2]

39.     Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they disabled all cookies and tracking technologies in use on the Website, especially those used to "operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Disable All" button.

40.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "Disable All" button, they provided notice to Defendant that they did not consent

---

[2] Users who instead elected to choose the "Customize Settings" button in the banner were presented with Defendant's Privacy Preferences Center window. There, Defendant further disclosed that there were at three categories of cookies in use on its Website—Performance, Functional, and Targeting cookies—all of which users could disable in the Privacy Preference Center window. These were presumably the categories of cookies users disabled when they clicked or selected the "Disable All" button. Defendant specifically identified Google cookies (doubleclick.net) and X/Twitter cookies (t.co) as among those "Targeting" cookies that users could choose to disable or otherwise reject.

CLASS ACTION COMPLAINT

to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third Parties' tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

41. In particular, when users clicked or selected the "Disable All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by disabling cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

42. Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Disable All" button on the Website's popup cookie consent banner.

CLASS ACTION COMPLAINT



43.     The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.crypto.com. The screenshot depicts only network traffic occurring *after* the user disabled all cookies using the cookie banner. As shown above, despite the user's choice to disable all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, www.google.com, analytics.twitter.com, tr.snapchat.com, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. This screenshot demonstrates that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers disabled or rejected all cookies and tracking technologies

CLASS ACTION COMPLAINT

by clicking or selecting the "Disable All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's choice to disable all cookies.

44.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

45.     As users interact with the Website, even after clicking or selecting the "Disable All" button, thereby declining or rejecting the use of cookies and similar technologies for advertising and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

46.     The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties— separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When

the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.** **The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website.**

**1.** **The Website Causes the Interception of the Contents of Communications**

47.     The Website includes a search bar and forms where users input information. For example, below is a screenshot of the search bar on the Website where users can type into the search bar to cause the Website to search its contents for specific financial assets.



48.     When users input the information into the search bar, such as an asset they are interested in, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

49.     Instead, the software on the Website causes the contents of the communication to be intercepted while in transit.

**2.** **Facebook Cookies**

50.     Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to "Disable All" cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection,

CLASS ACTION COMPLAINT

behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

51.    The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when a user views a page on the Website:

[REMAINDER OF PAGE INTENTIONALLY BLANK]

---

[3] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

| Key | Value |
|---|---|
| id | 365817910948211 |
| ev | PageView |
| dl | https://crypto.com |
| rl | |
| if | false |
| ts | 1708027748538 |
| sw | 2240 |
| sh | 1260 |
| v | 2.9.147 |
| r | stable |
| a | tmgoogletagmanager |
| ec | 0 |
| o | 4124 |
| fbp | fb.1.1708027706404.976815560 |
| cs_est | true |
| pm | 1 |
| hrl | 33a65f |
| ler | empty |
| cdl | API_unavailable |
| it | 1708027748485 |
| coo | false |
| cs_cc | 1 |
| cas | 5293322920783170,6321732981172083,503562107 3201257,422738589069808,565862759088825,4 285237551513109,3985344954925673,7253630514 711861,5008798759212181,3651342454988561,58 57415794273266,4192772407505393,29239745509 78190,2512385988783759,2779750508762291 |
| exp | e1 |
| rqm | GET |

52.    The "ev" parameter is an "Event." In this case, the event is a "PageView," indicating to Facebook that the user has viewed a specific webpage on the Website.

53.    The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://crypto.com.

54.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

CLASS ACTION COMPLAINT

55.     The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

56.     The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

57.     Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the PageView event above:



58.     The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as viewing pages, adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

59.     In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to

CLASS ACTION COMPLAINT

show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[5]

60.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[6]

61.    Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[5] https://allaboutcookies.org/what-data-does-facebook-collect.

[6] *Id.*

CLASS ACTION COMPLAINT

62.     In addition, the software code executed when a user visits the Website causes the consumer's browser to send "header" data to Facebook. This data includes the "user-agent," which corresponds to the device and browser that the user has used to access the Website:

user-agent                 Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
                           AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                           121.0.0.0 Safari/537.36

63.     Finally, the data sent to Facebook contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

### 3.     Google Cookies

64.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Disable All" cookies (including those cookies used for advertising and analytics) to and from the **www.google.com**, **www.google-analytics.com**, **www.googleadservices.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[7] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[8] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within

---

[7] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[8] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

CLASS ACTION COMPLAINT

Google's ad network.[9]

65.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[10] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

66.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[11] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page,

---

[9] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[10] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[11] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

CLASS ACTION COMPLAINT

clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[12]

67.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[13]

68.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's advertising domain, at https://googleads.g.doubleclick.net:

---

[12] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[13] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

69.     The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

70.     The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing.

71.     The "u_h" and "u_w" parameters correspond to the user's screen height and width.

72.     Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:



73.     According to Google's documentation, the "IDE" cookie "is used to personalize the ads you see," and is "used to show Google ads on non-Google sites."[14]

---

[14] https://policies.google.com/technologies/cookies?hl=en-US.

74.     Defendant described Google's "IDE" cookie as follows in its Privacy Preference Center under the "Targeting Cookies" category:



75.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:



76.     Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

77.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

CLASS ACTION COMPLAINT

78.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[15]

79.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[16] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

    **4.     Twitter Cookies**

---

[15] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[16] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

80.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Disable All" cookies, to and from other domains, including **t.co** and **analytics.twitter.com**. These domains are associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[17] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[18]

81.     For example, the following data was sent to Twitter when a user browsed the Website:



---

[17] *See* https://help.x.com/en/rules-and-policies/x-cookies.

[18] *Id.*

CLASS ACTION COMPLAINT

82.    As the "integration" parameter makes clear, Twitter is acting as an "advertiser" for the purposes of this data transmission.

83.    Along with this data, the following cookie data was sent to Twitter:



84.    X's documentation confirms that the "muc_ads" "is for advertising."[19]

85.    Defendant described X's "muc_ads" cookie as follows in its Privacy Preference Center under the "Targeting Cookies" category:



86.    Similar data is sent to https://analytics.twitter.com when users browse the Website. Along with that data, the following cookie data is also sent to that domain:

---

[19] https://help.x.com/en/rules-and-policies/x-cookies

CLASS ACTION COMPLAINT

87.     According to X's documentation, the "personalization_id" cookie "tracks activities on and off Twitter for a personalized experience."[20]

88.     These cookies allow X Corp to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

89.     Further, along with this data, the Twitter software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:



90.     Finally, the data sent to Twitter contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

**5. Snapchat Cookies**

91.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject them, to and from the **tr.snapchat.com** domain. This subdomain is associated with Snap Inc., the social media

[20] *Id.*

company that owns Snapchat. Snapchat is multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses tr.snapchat.com cookies (including the "sc_at" cookie) to collect data on user identifying data (including name and email address),[21] user demographics (including age and geographic location),[22] browsing history, choices, and interactions with advertisements.[23] This data helps Snap personalize ad content and track users across the internet.[24] As Snap explains, it uses the data collected by Snapchat cookies "for optimization, custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are … meant to deliver better results for our ad products."[25]

92.    Defendant described Snapchat's "sc_at" cookie as follows in its Privacy Preference Center under the "Targeting Cookies" category:

| snapchat.com | |
|---|---|
| View Privacy Policy | |
| View Cookies ▼ | |
| Name | sc_at |
| Host | snapchat.com |
| Duration | 389 Days |
| Type | Third Party |
| Category | Targeting Cookies |
| Description | This cookie is associated with embedding content from Snapchat and is used to identify a user across multiple domains. |

---

[21] *See* Snap for Developers: Parameters (available at https://developers.snap.com/api/marketing-api/Conversions-API/Parameters).

[22] Id.

[23] *See* Snapchat Business Help Center: Directly Implement the Pixel On Your Website (available at https://businesshelp.snapchat.com/s/article/pixel-direct-implementation).

[24] *Id*.

[25] Snapchat Business Help Center: Pixel Implementation FAQ (available at https://businesshelp.snapchat.com/s/article/snap-pixel-faq); *see also* Snapchat Business Help Center: About Snap Pixel (available at https://businesshelp.snapchat.com/s/article/snap-pixel-about).

CLASS ACTION COMPLAINT

93.     For example, the following type of data is sent to Snapchat when a user visits the Website:

```
POST    200   https://tr.snapchat.com/p

Request  Header  Query  Body  Cookies  Raw  Summary  +                        PLAIN ↕

 1 ∨ {
 2 ∨   "ctx": {
 3 ∨     "a": [
 4         188,
 5         194,
 6         157,
 7         0,
 8         336
 9       ],
10       "bt": "1d53c387",
11       "c1": "963bbb30-38cb-4411-9e9b-a3c3e56e9e3a",
12       "d_a": "arm",
13       "d_bvs": "[{\"brand\":\"Not A(Brand\",\"version\":\"99.0.0.0\"},
          {\"brand\":\"Google Chrome\",\"version\":\"121.0.6167.139\"},
          {\"brand\":\"Chromium\",\"version\":\"121.0.6167.139\"}]",
14       "d_os": "13.5.1",
15       "d_ot": "macOS",
16       "df": true,
17       "huah": true,
18       "lc": "dee2842e-e81c-4caa-aa19-e025e987e842",
19       "ls": "ac43b5e7-6554-4ed3-9c35-5e1748d5779b",
20 ∨     "p": [
21         188,
22         194,
23         157,
24         336,
25         0
26       ],
```

CLASS ACTION COMPLAINT

```
27      "pv": 2,
28      "r": "8700d1d2-08b4-4837-9ffd-77543bd7a8b3",
29      "rd": 22163,
30      "rf": "https://crypto.com/us",
31      "sa": 1707417788079,
32      "sh": 900,
33      "sps": 21478,
34      "ss": "8758c77e-d99a-4dd7-a9a9-d7845ccf96fd",
35      "sw": 1440,
36      "ts": 1707417799557,
37      "ua": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
        AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/
        537.36",
38      "url": "https://crypto.com/us/about",
39      "v": "3.9.1-2402072137"
40    },
41    "req": [
42      {
43        "del": 39,
44        "md": {
45          "btx": "Ecosystem",
46          "pids": [
47            "9ed2bd68-b93c-44da-b4c6-0ed31b4de0e2"
48          ]
49        }
50      }
51    ],
52    "u_scsid": "8758c77e-d99a-4dd7-a9a9-d7845ccf96fd"
53  }
```

94. Alongside this data, the following cookie data is sent to Snapchat. The following data were sent when a user browsed the Website:



95. According to Snap Inc.'s documentation, the "sc_at" cookie is "Used to identify a visitor across multiple domains," meaning that it is a tracking cookie capable of tracking a user even after the user exits the Website and browses other sites.[26] The documentation also confirms that the cookie persists on the user's device for a period of one year.[27]

96. Snapchat cookies allow Snap to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information,

---

[26] *See* https://www.snap.com/privacy/cookie-information.

[27] *Id.*

CLASS ACTION COMPLAINT

including age and location,[28] (v) user input data, including name and email address,[29] (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and/or (xii) geolocation data.

97.    Like the other third-party websites, Snapchat receives user-agent data and IP addresses for each request.

### D.    The Private Communications Collected are Valuable.

98.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

99.    The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its cryptocurrency exchange services to consumers in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

---

[28] *See* Snap for Developers: Parameters (available at https://developers.snap.com/api/marketing-api/Conversions-API/Parameters).

[29] *Id.*

CLASS ACTION COMPLAINT

100.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's cryptocurrency exchange services. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the cryptocurrency market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

101.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[30] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

102.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

103.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Ortiz

104.    Plaintiff Ortiz visited the Website to seek information about Defendant's cryptocurrency exchange services, while located in California, on one or more occasions during the last four years.

---

[30] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

105.    Plaintiff Ortiz's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's services. Specifically, Plaintiff Ortiz is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

106.    Specifically, Plaintiff Ortiz visited the Website to obtain information about both the rates and prices for specific cryptocurrencies in which he was interested.

107.    When Plaintiff Ortiz visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Disable All" button. Plaintiff Ortiz viewed Defendant's representation on the popup cookie consent banner that, "We use cookies on our website to operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics." Plaintiff Ortiz also viewed Defendant's additional representation that, rather than choosing to "Accept All" cookies, users could instead elect to "Disable All" cookies.

108.    Consistent with his typical practice in disabling or otherwise declining or rejecting the placement or use of cookies and tracking technologies, Plaintiff Ortiz selected and clicked the "Disable All" button. Plaintiff Ortiz believed that selecting the "Disable All" button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (including those used for advertising and analytics).

109.    In selecting the "Disable All" button, Plaintiff Ortiz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Ortiz specifically disabled, based on Defendant's representations, those cookies used to "operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Ortiz continue browsing the Website.

110.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and

analytics, to be placed on Plaintiff Ortiz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Ortiz's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Ortiz that he could reject the use and/or placement of all such cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Ortiz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

111.    Then, as Plaintiff Ortiz continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Ortiz's clear choice to disable the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Ortiz's Private Communications as Plaintiff Ortiz browsed the Website.

112.    Defendant's representations that consumers could "Disable All" cookies while Plaintiff Ortiz's and users browsed the Website, or at least those involved in providing advertising and analytics services, were untrue. Had Plaintiff Ortiz known this fact, he would not have used the Website. Moreover, Plaintiff Ortiz reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all such cookies, Plaintiff Ortiz would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

113.    Plaintiff Ortiz continues to desire to browse content featured on the Website. Plaintiff Ortiz would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Website were programmed to honor users' requests to disable all  cookies and tracking technologies, Plaintiff Ortiz would likely browse the Website again in the future, but will not do so until then. Plaintiff Ortiz regularly visits websites that

feature content similar to that of the Website. Because Plaintiff Ortiz does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to disable all cookies and tracking technologies, Plaintiff Ortiz will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Ortiz is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Hernandez**

114.    Plaintiff Hernandez visited the Website to seek information about Defendant's cryptocurrency exchange services, while located in California, on one or more occasions during the last four years.

115.    Plaintiff Hernandez's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's services. Specifically, Plaintiff Hernandez is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

116.    Specifically, Plaintiff Hernandez visited the Website to obtain information about trading, crypto assets, including pricing, and Defendant's credit cards offering.

117.    When Plaintiff Hernandez visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Disable All" button. Plaintiff Hernandez viewed Defendant's representation on the popup cookie consent banner that, "We use cookies on our website to operate our site, enhance your experience, analyze our traffic and conduct advertising

and analytics." Plaintiff Hernandez also viewed Defendant's additional representation that, rather than choosing to "Accept All" cookies, users could instead elect to "Disable All" cookies.

118.    Consistent with his typical practice in disabling or otherwise declining or rejecting the placement or use of cookies and tracking technologies, Plaintiff Hernandez selected and clicked the "Disable All" button. Plaintiff Hernandez believed that selecting the "Disable All" button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (including those used for advertising and analytics).

119.    In selecting the "Disable All" button, Plaintiff Hernandez gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Hernandez specifically disabled, based on Defendant's representations, those cookies used to "operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Hernandez continue browsing the Website.

120.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and analytics, to be placed on Plaintiff Hernandez's device and/or transmitted to the Third Parties along with user data, without Plaintiff Hernandez's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Hernandez that he could reject the use and/or placement of all such cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Hernandez believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

121.    Then, as Plaintiff Hernandez continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Hernandez's clear choice to disable the use and/or placement of such cookies and tracking technologies, Defendant

nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Hernandez's Private Communications as Plaintiff Hernandez browsed the Website.

122. Defendant's representations that consumers could "Disable All" cookies while Plaintiff Hernandez's and users browsed the Website, or at least those involved in providing advertising and analytics services, were untrue. Had Plaintiff Hernandez known this fact, he would not have used the Website. Moreover, Plaintiff Hernandez reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all such cookies, Plaintiff Hernandez would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

123. Plaintiff Hernandez continues to desire to browse content featured on the Website. Plaintiff Hernandez would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Website were programmed to honor users' requests to disable all cookies and tracking technologies, Plaintiff Hernandez would likely browse the Website again in the future, but will not do so until then. Plaintiff Hernandez regularly visits websites that feature content similar to that of the Website. Because Plaintiff Hernandez does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to disable all cookies and tracking technologies, Plaintiff Hernandez will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

CLASS ACTION COMPLAINT

whom. Plaintiff Hernandez is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

124.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the State of California after clicking the "Disable All" button in the popup cookies consent banner.

125.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

126.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

127.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to disable all  cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

128.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

CLASS ACTION COMPLAINT

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

129.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, each of the Plaintiffs, like the other Class members, visited the Website, disabled cookies, and had their confidential Private Communications intercepted by the Third Parties.

130.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in each of their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

131.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions

would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

132.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

133.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

134.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

135.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Disable All" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members disabled all cookies and reasonably expected that their choice to disable cookies and tracking technologies would be honored. That is, he and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices

while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they disabled such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

136.     Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

137.     Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

138.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

139.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

140.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

141.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

142.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

143.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to disable the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## <u>Second Cause of Action</u>: Intrusion Upon Seclusion

144.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

145.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

1  a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a

2  reasonable person.

3      146.    By permitting third-party cookies to be stored on consumers' devices without

4  consent, which caused the Third Parties to track and collect Plaintiffs' and Class members'

5  Private Communications, including their browsing history, visit history, website interactions,

6  user input data, demographic information, interests and preferences, shopping behaviors, device

7  information, referring URLs, session information, user identifiers, and/or geolocation data, in

8  violation of Defendant's representations otherwise in the popup cookie consent banner,

9  Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant

10 effectively placed the Third Parties in the middle of communications to which they were not

11 invited, welcomed, or authorized.

12     147.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's

13 Private Communications on the Website using third-party cookies that Defendant caused to be

14 stored on users' devices—and to be transmitted to Third Parties—was not authorized by

15 Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Disable

16 All" cookies.

17     148.    Plaintiffs and the Class members had an objectively reasonable expectation of

18 privacy surrounding their Private Communications on the Website based on Defendant's

19 promise that users could "Disable All" cookies, as well as state criminal and civil laws designed

20 to protect individual privacy.

21     149.    Defendant's intentional intrusion into Plaintiffs' and other users' Private

22 Communications would be highly offensive to a reasonable person given that Defendant

23 represented that Website users could "Disable All" cookies when, in fact, Defendant caused such

24 third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to

25 third parties, even when consumers disabled all such cookies. Indeed, Plaintiffs and Class

26 members reasonably expected, based on Defendant's false representations, that when he and they

27 disabled all cookies and tracking technologies, Defendant would not cause such third-party

28

cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

150.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

151.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

152.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

153.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to disable the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action**: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

154.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

155.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

156. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

157. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

158. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

159. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

160.    Defendant is a "person" within the meaning of California Penal Code § 631.

161.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

162.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

163.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

164.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

165.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user

input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

166. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

167. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

168. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

169. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or

otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to disable cookies in the consent banner.

170.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members each accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

171.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

172.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

173.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for

CLASS ACTION COMPLAINT

information and content related to cryptocurrency. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to disable cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

174.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

175.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

176.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

177.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

178.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address

and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

179.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

180.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

181.    Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "Disable All" button in the cookie consent banner.

182.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

183.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

184.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action**: Common Law Fraud, Deceit and/or Misrepresentation

185.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

186.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Disable All" cookies.

187.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Disable All" cookies button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Disable All" cookies.

188.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Disable All" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

189.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

190.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices,

including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

191.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

192.    Defendant's representation that consumers could disable all cookies (including those cookies used to "operate [the Web]site, enhance your experience, analyze our traffic and conduct advertising and analytics") if they clicked or selected the "Disable All" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to advertising and analytics, and/or share information with third parties even after they choose to disable all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

193.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to disable all cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

CLASS ACTION COMPLAINT

194.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

195.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

196.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to disable the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

197.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

198.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

199.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Disable All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members disabled all such cookies.

200.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

201.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

202.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

203.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

204.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

205.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

206.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

CLASS ACTION COMPLAINT

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: October 17, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:  (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

## AMERICAN ARBITRATION ASSOCIATION

## MIAMI REGIONAL OFFICE

| | |
|---|---|
| JAVIER HERNANDEZ, | Arbitration Case No. |
| Claimant, | **COMPLAINT AND DEMAND FOR ARBITRATION** |
| v. | |
| FORIS DAX, INC., | |
| Respondent. | |

        Claimant Javier Hernandez ("Claimant") brings this action against Foris Dax, Inc. ("Respondent" or "Foris Dax").[1] Claimant's allegations are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

### INTRODUCTION

        1.       This Complaint and Arbitration Demand concerns an egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent's website, www.crypto.com (the "Website"), is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website even after users reject such

---

[1] Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable.

cookies. Respondent presents all visitors to the Website with a cookies pop-up banner that stated that the Website uses cookies to "operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics" and purports to give Website users the opportunity to "Disable All" cookies in use on the Website, rather than "Accept All" cookies. By clicking the "Disable All" button, Claimant believed that he was indicating his choice/agreement to reject or decline "All" cookies in use on the Website, or at least all "Performance Cookies," "Functional Cookies," and "Targeting Cookies." Claimant, and hundreds of thousands of Website visitors, did just that—they clicked or selected the "Disable All" button and proceeded to browse the Website. But, unbeknownst to them, and contrary to their express election to disable "***All*** ***cookies, including all Performance, Functional, and Targeting Cookies***, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records—including Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co), among others— to be placed on the Claimant's device(s). In doing so, Respondent caused the transmission of extensive data about Claimant to undisclosed third parties for performance, functional, targeted advertising, and other purposes, contrary to Respondent's representations and Claimant's express directions.

2.    Many of the third-party cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers are among the Performance, Functional, and Targeting cookies that Claimant and other users thought they had rejected or declined, which are designed to track consumers' behavior across websites for advertising and other purposes. These cookies are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

3.    Respondent allowed these third parties access to Claimant's and other Website users' communications with Respondent and enabled them to collect data on consumers for use for those parties' own purposes, including building profiles of consumers' interests and targeting

advertising to them. This type of monitoring and data sharing is exactly what consumers, such as Claimant, who chose to disable "All" such cookies, sought to avoid. Despite receiving notice of consumers' declination of consent, through their express election to disable "All" cookies, Respondent defied it. In doing so, Respondent violated privacy statutes, state consumer protection statutes, tort duties, and breached its contract and the implied covenant of good faith and fair dealing with Claimant.[2]

## **PARTIES**

4.    Claimant Javier Hernandez is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

5.    Respondent Foris Dax, Inc. is a Delaware corporation with its principal place of business in Miami, Florida. Respondent does business in California through an online cryptocurrency trading platform promoted through the Website to residents of California.

## **SUBSTANTIVE ALLEGATIONS**

6.    Respondent operates a cryptocurrency exchange and offers financial services related to cryptocurrencies such as Bitcoin, Etherium, and Cronos, among many others. Respondent promotes its cryptocurrency exchange and its other financial products and/or services through its Website. The Website allows visitors to, among other things, download Respondent's cryptocurrency trading application, view cryptocurrency prices, browse non-fungible tokens (or NFTs), and access cryptocurrency trading resources.

7.    Respondent chose to integrate the Website with cookies from third parties, which, among other things, track users' behavior on the Website.

8.    Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are cookies that are placed on a user's browser directly by the webserver with

---

[2] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration, including without limitation jurisdiction, scope, and applicability.

which the user is knowingly communicating (in this case, the Website). Third-party cookies are cookies that are set by other webservers (e.g. facebook.com, doubleclick.net, etc.). When a consumer visits the Website, both first-party cookies and third-party cookies are placed on the consumer's browser. All of this is caused by software code that Respondent incorporates into its Website, or that Respondent causes to be loaded. Because Respondent controls the software code of its Website, it has complete control over whether first-party and third-party cookies are set on users' devices when they visit the Website.

9.    Third-party cookies, including those on the Website, are typically designed to track and record an internet user's communications with and activities on websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

10.    Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and target those users with advertisements tailored to their interests.

11.    As a research director at the Electronic Frontier Foundation put it, third-party cookies allow these companies "to be a silent third-party watching whatever you're doing."[3]

12.    Every website is hosted by a web server through which it sends and receives communications with internet users and their web browsers to display web pages on users' devices.

13.    Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

communication. The HTTP request tells the web server what information is being requested and instructs the web server to send that information to the user.

14.     When a website has third-party cookies, those cookies are simultaneously placed on the user's device and made accessible to the user's browser. This allows third-party cookie companies to intercept contents of the internet user's communications with websites, including data such as the URLs being browsed by the user; the webpage title; button clicks; and the date and time of the website visit.

15.     URLs, for instance, both identify an internet resource and describe its location or address. They often contain the name of the website, folder, and sub-folders on the server and the name of the file requested. "[W]hen users enter URL addresses into their web browser using the 'http' web address format, or click on hyperlinks, they are actually telling their web browsers...which resources to request and where to find them." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1101 (9th Cir. 2014). "Thus, the URL provides significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 at 596 (9th Cir. 2020).

**A.     Respondent's Cookies Pop-Up Banner Falsely Informs Consumers They May "Disable All" Cookies.**

16.     When users visit the Website, a cookies pop-up banner is immediately displayed to the user. As shown in the screenshot below, the pop-up banner states that Respondent uses "cookies on our website to operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics." Further, Respondent presents Website users with several apparent options with respect to cookies, which are to "Accept All" cookies, "Disable All" cookies, and "Customize Settings," as shown in the screenshot below:

17.     Consistent with Claimant's typical practice and preference in disabling all cookies, especially those cookies responsible for analytics and targeted advertising, Claimant clicked on or selected the "Disable All" button, indicating his choice and/or agreement to disable, and thereby decline or reject, all cookies in use on the Website, including all Performance, Functional, and Targeting cookies. Respondent's cookies pop-up banner led Claimant, and those similarly situated, to believe that they had disabled, and thereby declined or rejected, **all cookies, including all Performance, Functional, and Targeting cookies**. That belief, however, was false.

18.     In truth, Respondent did not abide by its users' wishes. Even though Respondent received notice that certain users, through the selection of the "Disable All" button found on the cookies pop-up banner, did not consent to the disclosure of their personal information, nor the third-party cookies causing such disclosure, Respondent nonetheless placed third-party cookies, including Performance, Functional, and Targeting cookies, among others, on those and other Website users' devices.

19.     Unbeknownst to Claimant, Respondent caused numerous cookies (including third-party Performance, Functional, and Targeting cookies, among others) to be stored on Claimant's device(s), which caused Claimant's personal data to be transmitted and/or sold to third parties for advertising and analytics purposes—the very same purposes Claimant had rejected in choosing to "Disable All" such cookies.

20.     The following screenshot shows examples of the third-party cookies and other data that the Website caused consumers' devices to transmit to third parties, such as Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co)—even *after* consumers selected the "Disable All" button:

**[Remainder of Page Intentionally Left Blank]**



21.    Many of the third-party cookies in this exemplar screenshot are, according to the definitions put forth in Respondent's own Privacy Preference Center,[4] among the Performance, Functional, and Targeting cookies Claimant and other Website users thought they had rejected through their choice to "Disable All" such cookies. For example, Facebook cookies are used by Meta/Facebook to profile web users and serve them advertising. The Google/DoubleClick and X/Twitter cookies also shown in this screenshot function similarly.

22.    The Google/DoubleClick and Twitter (t.co) cookies were identified in Respondent's Privacy Preference Center as "Targeting" cookies as shown in the screenshots below. The Privacy Preference Center did not disclose the Website's use of the Facebook cookie.

_____

[4] The Privacy Preference Center further explains and defines each category of cookies in use on the Website in this separate window. As of June 6, 2024, it is accessible either by selecting the "Customize Settings" button on the cookies pop-up banner or by selecting the "Cookies Preferences" link at the bottom of the Website's homepage.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





23.    Even though Respondent discloses the existence and use of cookies on the Website in its cookies pop-up banner, Privacy Preferences Center, and Privacy Policy, it does not adequately disclose that users, such as Claimant, would (and did) continue to receive cookies

COMPLAINT AND DEMAND FOR ARBITRATION

*even after they rejected them*. Besides the clear and unequivocal "Disable All" statement in Respondent's cookies pop-up banner, Respondent makes additional representations, such that users of its Website can "customize your preferences" with respect to the use and placement of cookies, as stated in Respondent's cookies pop-up banner.

24.    Respondent, in its Privacy Preference Center (which is *not* displayed to users who elect to "Disable All" cookies by selecting or clicking this button on the cookies pop-up banner), further discloses and informs users who view the statements in the Privacy Preferences Center that there are actually several categories of cookies in use on its Website, including Performance, Functional, and Targeting cookies, as well as "Strictly Necessary" cookies, which are "Always Active" and cannot be disabled. Respondent does not similarly inform users that Performance, Functional, and Targeting cookies are always active and cannot be disabled; therefore, by implication, users who select or click the "Disable All" button should be able to disable at least all Performance, Functional, and Targeting cookies in use on the Website, except Strictly Necessary cookies, which cannot be disabled.

25.    *Even if* Claimant and other users knew, or should have known, that they could not really "Disable All" cookies (in that they would continue to receive and/or Respondent would continue to place the Strictly Necessary cookies essential for the function of the Website), then there is *nothing* in Respondent's cookies pop-up banner, Privacy Preference Center, and Privacy Policy, or elsewhere, that could reasonably be construed as notice to Claimant and other Website users that they would continue to receive Performance, Functional, and Targeting cookies, or other cookies, that would collect and use Claimant's personal data for purposes not strictly necessary for the Website's operation, after expressly disabling "All" such cookies.

26.    Unlike the Strictly Necessary cookies Respondent purportedly uses to ensure the proper operation of the Website, the Performance, Functional, and/or Targeting cookies that Respondent wrongfully places on its users' devices and/or browsers allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the website visits; the IP address of consumers' devices; consumers' geolocation; product page visits; and data consumers

supply to the Website, such as data entered into forms on the Website. The identifier data sent to the third party with this information allows that third party to correlate the data to the user or the user's device. As such, third parties can—and almost invariably do—use it to develop and enrich profiles on consumers like Claimant and target them with advertising.

27.    The Performance, Functional, and Targeting cookies on the Website enable third parties, like Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co), among others, to link individual users and devices with data regarding specific browsing activity on the Website.

28.    The Performance, Functional, and Targeting cookies that Respondent wrongfully placed on users' devices enabled third parties to track users' browsing history on the Website. Every time a user visits a new page on the Website, even after disabling "All" cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data.

**B.    Third Parties Exploit Data Received from the Cookies on the Website**.

29.    The more webpages a user browses and interacts with on the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully allows to be stored on users' devices and browsers enable third parties to compile a vast repository of consumers' browsing activity, including Claimant's, and to receive access to information that is otherwise unknowable. These third parties leverage the wrongfully collected information to their advantage, using it to compile browsing histories and habits into personal profiles on consumers, which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from the Website, allow third parties to draw inferences from information collected about users' browsing and search history on the Website to create profiles about consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

30.    For example, Meta, whose Facebook cookies appear on the Website, provides internet advertising in the manner described and alleged above. Facebook cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the user. These cookies can attribute such

information to individual users by way of their Facebook user ID or account, which often identifies users by name, thus creating a dossier about the individual.

31.    Just as the data that the third-party cookies collect from Website users is valuable to Meta, Google, X (formerly Twitter), and other third-party cookie companies, it is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Website and their interests in, among other things, specific cryptocurrency, securities, and/or other financial products.

32.    Performance, Functional, and/or Targeting cookies, such as the cookies Respondent falsely claimed that Claimant and other Website users could reject, are particularly useful for Respondent's advertising. For instance, if Respondent wanted to market certain cryptocurrency, securities, or other financial products to users, Respondent could use such cookies to monitor which consumers visit the webpages that relate to those specific cryptocurrencies, securities, or other financial products. Respondent can then advertise additional products and/or services related to those specific kinds of cryptocurrencies, securities, or other financial products that users had viewed to those same users across the internet.

33.    Respondent's own Privacy Policy admits as much. It states, among other things, that Respondent may use the personal information of its users to "deliver relevant content and advertisements to you and measure or understand the effectiveness of the advertising we serve to you."

**C.    The Intercepted Data Is Valuable.**

34.    The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

35.     The value of the consumers' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.



36.     Similarly, the value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected—without permission—through the cookies on the Website. For example, Google Inc. operates a consumer research panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

37.     As part of the program, panel participants add a browser extension that shares with Google the websites that users visit and how the panelists use them. The panelists **consent** to Google tracking this information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

38.     After a panelist participates for three months, Google offers to pay additional gift cards "for staying with" the panel. These gift cards, valued at or around $5, demonstrate

conclusively that internet industry participants understand the enormous value in internet users' browsing habits. Google has subsequently offered to pay Screenwise participants up to $3 per week to be tracked.

39.    Other platforms have recently developed that offer consumers the opportunity to directly monetize their own data. Killi, for instance, is a data exchange platform that allows consumers to own and earn income from their data.[5] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[6]

40.    The Nielsen Company is another example. Nielsen has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. After a consumer installs Nielsen's application on his or her computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks user's activity. In return, Nielsen enters users into sweepstakes with monetary benefits and compensates users with points worth up to $50 per month.[7]

41.    Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[8]

42.    The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt-out of data collection, the CCPA also expressly

---

[5] https://killi.io/about-us/

[6] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[7] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[8] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app.

provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

43.     Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself while depriving consumers of their ability to choose if and how they wish to monetize their personal data.

## CLAIMANT'S EXPERIENCES

44.     During the last year, Claimant visited the Website and viewed content available on the Website.

45.     When Claimant visited the Website, he was presented with Respondent's cookies pop-up banner, which stated that Respondent uses "cookies on our website to operate our site, enhance your experience, analyze our traffic and conduct advertising and analytics." Respondent's cookies pop-up banner further indicated that Claimant and other Website users could choose to "Accept All" cookies or "Disable All" cookies.

46.     Consistent with Claimant's typical practice in disabling cookies and in limiting the collection, usage, and sharing of his personal data for advertising and analytics purposes, Claimant clicked the "Disable All" button. Respondent's Website did not display the Privacy Preference Center or any further explanation to users, like Claimant, who clicked or selected the "Disable All" button. Thus, when Claimant selected the "Disable All" button, he reasonably expected that "All" cookies would be disabled on the Website and Respondent would not use Claimant's personal data for advertising and analytics purposes. Respondent's cookies pop-up banner led Claimant, and other Website users, to believe that they had disabled, if not "All" cookies, then at least all Performance, Functional, and Targeting cookies (as further disclosed or explained in Respondent's Privacy Preference Center), as well as rejected or declined Respondent's collection, use, and sharing of personal data for those purposes.

47.    Claimant believed that disabling "All" cookies, or at least all Performance, Functional, and Targeting cookies, would keep his communications with the Website private.

48.    By choosing to disable "All" cookies, including at least all Performance, Functional, and Targeting cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies from the Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Website.

49.    Despite the fact that Claimant chose to disable "All" cookies, including at least all Performance, Functional, and Targeting cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of third-party Performance, Functional, and Targeting cookies, including those from Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co), along with many others, on his device. In doing so, Respondent caused the transmission of Claimant's private communications and data to third parties as Claimant browsed the Website.

50.    Respondent's representation that consumers could disable, if not "All" cookies, then at least all Performance, Functional, and Targeting cookies, was untrue. Had Claimant known this fact, he would not have used the Website.

51.    Moreover, Claimant reviewed the cookies pop-up banner prior to using the Website. Had Respondent disclosed that it would continue to cause such third-party cookies to be stored on consumers' devices even when they choose to disable all such cookies, Claimant would have noticed it and would not have used the Website or, at a minimum, would have interacted with the Website differently.

52.    Claimant continues to desire to browse the Website and would like to browse other, similar websites that do not misrepresent that users can disable, if not "All" cookies, at least all Performance, Functional, and Targeting cookies, as well as the collection, use, and sharing of personal data for those purposes. If the Website was reconfigured to honor users' request to disable all such cookies, Claimant would likely browse the Website again in the future but will not do so until then.

53.    Claimant regularly visits websites that feature content similar to that of the Website. Because Claimant does not know how the Website is configured, which can change

over time, and cannot test whether the Website honors users' requests to disable, if not "All" cookies, then at least all Performance, Functional, and Targeting cookies, Claimant will be unable to rely on Respondent's representations when browsing the Website in the future absent an injunction that prohibits Respondent from making misrepresentations on its Website.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

54.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

55.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

56.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

57.    Article I, Section 1 of the California Constitution provides:

> "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy."

58.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control

circulation of personal information. This is essential to social relationships and personal freedom.[9]

59.     This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this growing threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[10]

In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

60.     To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

61.     Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could "Disable All" cookies, including at least all Performance,

---

[9] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[10] *Id.*

Functional, and Targeting cookies. Claimant directed his electronic devices to access the Website. When Claimant was presented with the cookies pop-up banner on the Website with a "Disable All" button, he reasonably expected that his action to disable "All" cookies, including at least all Performance, Functional, and Targeting cookies, would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies while he browsed the Website. Claimant also reasonably expected that, if he disabled such cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

62.     Respondent, in violation of Claimant's reasonable expectation of privacy, allowed third-party cookie companies to collect, track and compile the web browsing activity and communications of Website users, including Claimant. The data that Respondent allowed third parties to collect enabled third parties to assemble comprehensive profiles of Claimant's life. Those profiles can be, and are, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes as described herein, thereby harming Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of his personal information.

63.     Respondent's actions constituted a serious invasion of privacy in that those actions invaded a zone of privacy protected by the Fourth Amendment—i.e., one's personal communications—and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

64.    Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

65.    The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

66.    Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

67.    Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

68.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

69.    California Penal Code § 631(a), which prohibits wiretapping, provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

70.    To establish liability under § 631(a), a Claimant need only establish that Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

71.    Respondent is a "person" within the meaning of California Penal Code § 631.

72.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

73.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

74.    Respondent utilizes software code on the Website that allows third parties to intercept Claimant's private communications and web activity on the Website.

75.    The Website causes the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Website in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including, but not limited to, Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co), to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

76.     Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

77.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and even if they do not, Respondent's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Website, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third-parties; (ii) the third-party cookies on the Website; (iii) Respondent's computer servers, including the software code modules installed on and/or served by those servers, used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Foris Dax Instruments").

78.     The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the Foris Dax Instruments alleged above included the following:

- internet IP address of consumers' devices;
- the URLs browsed by users of the Website, as well as the referrer URL;
- the title of webpage viewed;
- webpage keywords;
- the exact date and time of the website visits; and
- device identifiers.

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

79.     By enabling the Foris Dax Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without Claimant's consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track, and analyze such Private Communications, Respondent violated Section 631(a) of the CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by Claimant to access the Website;

- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by Claimant to access the Website and allowed third parties to do so;

- willfully, and without the consent of Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;

- used Claimant's Private Communications to increase Respondent's profits;

- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and

- aided, agreed with, and conspired with other persons (including, without limitation, Meta, Google, X (formerly Twitter), and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

80.     Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

81.     Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the internet to search for

information about Respondent's products, as well as cryptocurrency, securities, and other related financial products offered through other exchanges. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to disable cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent and third parties have already intercepted Claimant's Private Communications, and are currently sharing, and will continue sharing, that information with additional third parties, unless and until enjoined.

82.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

**THIRD CAUSE OF ACTION**

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

83.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

84.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

85.    California Penal Code § 635 provides as follows:

Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

86.     Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Foris Dax Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

87.     In particular, the Foris Dax Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, even though Claimant intended to disable "All" cookies, including all Performance, Functional, and Targeting cookies, the software code modules of the Foris Dax Instruments were designed to—and in fact did—cause the placement of such cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

88.     Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

89.     Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

90.     Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the internet to search for information about for, among other things, Respondent's financial products and/or services and similar financial products and/or services from other currency exchanges. Claimant continues to desire to use the internet for that purpose, including for the purpose of viewing content related to Respondent's products and/or services and similar products and/or services. Claimant has no practical way to know if his request to disable cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent has already collected his Private Communications, and is currently sharing, and will continue sharing, that information with third parties, unless and until enjoined.

91.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

92.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

93.    Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

94.    Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to third-party cookie companies; (ii) knowingly accessing and without permission using Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing and without permission making use of data from Claimant and other users' computers as well as allowing third-parties to do so.

95.    Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

96.    Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

97.    As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

98.    Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

99.    Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

100.    Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

### FIFTH CAUSE OF ACTION

**Violation of the California False Advertising Law,**

**Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")**

101.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

102.    Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of this Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its cookies pop-up banner.

103.    Respondent's cookies pop-up banner asserts facts about Respondent's services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that:

a. Users of Respondent's Website can either "Accept All" cookies or "Disable All" cookies by selecting or clicking the button associated with each apparent choice,

b. For those users who select the "Disable All" button, Respondent would not use cookies on the Website or place cookies on users' devices and/or browsers—let alone for "advertising and analytics" purposes—or, at the very least, Respondent would not use or place Performance, Functional, and Targeting cookies, as further clarified or explained in its Privacy Preference Center.

104.    These representations led reasonable consumers to believe that they could disable all such cookies and, in doing so, Respondent would not cause the placement of third-party cookies on consumers' devices and browsers for those purposes, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Website. Respondent had a duty to disclose that, despite consumers' election to disable "All" cookies, including at least all Performance, Functional, and Targeting cookies, the Website would nonetheless cause the user's browser to store such cookies and send data to third parties, who can then use that data to track the user's activity and target them with advertising.

105.    Claimant relied to his detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services—specifically its false and misleading representation that users could disable "All" cookies, including at least all Performance, Functional, and Targeting cookies—Claimant used the Website.

106.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

107.    Respondent's representation that consumers could disable "All" cookies, including at least all Performance, Functional, and Targeting cookies, if they elected to do so, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookies pop-up banner prior to using the Website. Had Respondent disclosed that it caused such cookies to be stored on consumers' devices, even when

they choose to disable such cookies, Claimant would have noticed it and would not have used the Website.

108.     Respondent's acts and omissions are likely to deceive the general public.

109.     Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the wrongfully collected information for, among other things, advertising and analytics.

110.     Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

111.     The aforementioned practices, which Respondent used, and continues to use, to its significant financial gain also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

112.     Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

113.     Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

114.     Claimant seeks a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

115.     Claimant seeks full restitution to Claimant of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent to Claimant by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon.

116.     Claimant seeks an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will

continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant has no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### SIXTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**

117.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

118.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Respondent has violated the UCL.

119.    Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

120.    Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading misrepresentations and omissions. Respondent misrepresented to Claimant and other web users that they could "Disable All" cookies, including all Performance, Functional, and Targeting cookies, when, in fact, Respondent caused such cookies to be placed on consumers' devices and browsers, even after users thought they had disabled those cookies. Respondent concealed and failed to disclose to Claimant and other Website users that it would cause such cookies and software code to be stored on consumers' devices and browsers which would cause the interception and transmission of data about users' activity on the Website and Private Communications to third parties and Respondent, despite consumers' clear refusal of such cookies. Further, Respondent failed to adequately disclose to Claimant and Website users that these third-party cookies enable third parties to track consumers' behavior across the Website and use that data to compile profiles of consumers for analytics and advertising purposes, even after such cookies are rejected or declined through consumers' express election

to "Disable All" such cookies. In particular, the third-party cookies that Respondent wrongfully placed on consumers' devices and browsers enabled third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Website. With this information, third parties can—and almost invariably do—develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

121.    These representations and omissions were misleading and deceptive.

122.    Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed to be private, and because Respondent made users' Private Communications available to third parties, despite representing that Website users could "Disable All" cookies, including all Performance, Functional, and Targeting cookies, as well as the use and/or disclosure of personal data for analytics and advertising purposes.

123.    Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Website that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear rejection or declination of such cookies through their election to "Disable All" such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

124.    Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of the Website. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused

injury to customers far greater than any alleged countervailing benefit. The harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of unwanted third-party cookies on consumers' devices and browsers even when consumers choose to "Disable All" such cookies).

125.    Further, Respondent's "unfair" acts and practices include its violation of property, economic, and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

126.    Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, as well as the use of consumers' personal data for analytics and advertising purposes.

127.    Claimant relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise to consumers that they could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, and, in light of that promise, would have relied on the misrepresentations and omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause such third-party cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of such third-party cookies.

128.    Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the

CLRA. Respondent's conduct also breached the promises Respondent made at least in its cookies pop-up banner, as well as in its Privacy Preference Center.

129.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

130.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, but, nonetheless, causing such cookies to be placed on users' devices and browsers and causing the transmission of consumers' Private Communications to third parties after users chose to disable "All" such cookies; (b) failing to inform consumers that third parties would collect their Private Communications after choosing to disable such cookies; and (c) failing to inform consumers that third-party cookie companies would use data collected to compile profiles on consumers after choosing to disable such cookies. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and does not implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to simply honor consumers' requests to disable such cookies.

131.    Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users not to sell their personal information when they chose to disable all such cookies, but Respondent nonetheless caused such third-party cookies to be placed on Claimant and other users' devices and browsers, and thereby sold their Private Communications to third parties.

132.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated

by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

133.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and Private Communications.

134.    Respondent's representation that consumers could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, if they elected to do so, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookies pop-up banner prior to using the Website. Had Respondent disclosed that it causes such Performance, Functional, and Targeting cookies to be stored on consumers' devices, even after they choose to disable "All" such cookies, Claimant would have noticed it and would not have used the Website.

135.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated, and repeated, in the State of California.

136.    Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

## SEVENTH CAUSE OF ACTION

**Violation of the Consumers Legal Remedies Act**

**California Civil Code §§ 1750, *et seq.* ("CLRA")**

137.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

138.    Respondent's actions, representations, and conduct described herein have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

139.    Claimant, and other Website users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

1    140.    The Website and Respondent's online platform services are "services" under the

2    CLRA.

3    141.    Respondent's representations, set forth in this Complaint, led Website users to

4    falsely believe that they could "Disable All" cookies, including at least all Performance,

5    Functional, and Targeting cookies. Website users further believed, that in doing so, Respondent

6    would not cause such cookies and third-party software code to be placed on consumers' devices

7    to cause the transmission of consumers' web activity and Private Communications to third

8    parties (which allow Respondent and third parties to track consumers' behavior on the Website).

9    By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent

10   has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

11   142.    In violation of California Civil Code § 1770(a)(5), Respondent's acts and

12   practices constitute improper representations that its Website service has sponsorship, approval,

13   characteristics, uses, or benefits, which it does not have. In violation of California Civil Code

14   § 1770(a)(7), Respondent's acts and practices constitute improper representations that its

15   Website service is of a particular standard, quality, or grade, when it is of another. In violation

16   of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell

17   them as advertised.

18   143.    Claimant requests that Respondent be enjoined from continuing to employ the

19   unlawful methods, acts and practices alleged herein pursuant to California Civil Code

20   § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the

21   future, Claimant and users will continue to suffer harm. Claimant has no adequate remedy at law

22   to stop Respondent's continuing practices.

23   144.    On or about February 21, 2024, Claimant provided Respondent with notice and a

24   demand to correct, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices

25   complained of herein. Despite receiving the notice and demand, Respondent failed to do so.

26   Among other things, Respondent failed to identify consumers, notify them of their right to

27   remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant

28

to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

145.    Claimant also requests that he be awarded costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

146.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

147.    To assert a claim for intrusion upon seclusion, Claimant must plead (i) that Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

148.    By causing unwanted cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent's representations that consumers could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, Respondent intentionally intruded upon the solitude and/or seclusion of users in that Respondent effectively placed third parties, including, but not limited to, Meta/Facebook, Google/DoubleClick, and X/Twitter (t.co), among others, in the middle of communications to which they were not invited, welcomed, or authorized.

149.    The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject or decline such cookies through his election to "Disable All" cookies.

150.    Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Website based on Respondent's promise that users could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, as well as state criminal and civil laws designed to protect individual privacy.

COMPLAINT AND DEMAND FOR ARBITRATION

151.    Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, when, in fact, it caused those cookies to be stored on consumers' devices and browsers even after consumers expressly chose to "Disable All" such cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause such cookies to be stored on Claimant's devices or cause the transmission of Claimant's internet activities to third parties.

152.    Respondent's conduct was intentional and intruded on Claimant's communications, which constitute private searches, web browsing activity, and other data.

153.    Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

        a.     Nominal damages;

        b.     General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

        c.     Sensitive and confidential information that Claimant intended to remain private is no longer private; and

        d.     Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

154.    Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

COMPLAINT AND DEMAND FOR ARBITRATION

1

## **NINTH CAUSE OF ACTION**

2

### **Breach of Contract**

3    155.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

4    156.    Respondent's relationship with its users is governed by the Website's cookies

5    pop-up banner, among other documents.

6    157.    These governing documents, including the Website's cookies pop-up banner,

7    contain enforceable promises that Respondent made to Claimant, including but not limited to the

8    following:

9        a.    Users of Respondent's Website can either "Accept All" cookies or "Disable All"

10            cookies by selecting or clicking the button associated with each apparent choice,

11        b.    For those users who select the "Disable All" button, Respondent would not use

12            cookies on the Website or place cookies on users' devices and/or browsers—let

13            alone for "advertising and analytics" purposes—or, at the very least, Respondent

14            would not use or place Performance, Functional, and Targeting cookies, as further

15            clarified or explained in its Privacy Preference Center.

16    158.    Respondent breached these duties and violated these promises by causing such

17    cookies and software code to be stored on Claimant's devices and browsers that cause the

18    transmission of private web activity and Private Communications to third parties and Respondent

19    even though Respondent represented that Claimant could "Disable All" such cookies and the

20    associated data sharing and use.

21    159.    Respondent further violated these provisions because Respondent did not honor

22    users' requests to reject or opt-out of the selling and sharing of online data through the use of

23    cookies and similar technologies, as described above, and because Respondent shared users'

24    information with third parties even when users did not consent to such sharing.

25    160.    At all relevant times and in all relevant ways, Claimant performed his obligations

26    under the contract(s) in question or was excused from performance of such obligations through

27    the unknown and unforeseen conduct of others.

28

161.    As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in the contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

162.    Respondent's breach caused Claimant the following damages:

    a.    Nominal damages;

    b.    The diminution in value of Claimant's personal information;

    c.    The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

    d.    Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

    e.    Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

163.    As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

## TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

164.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

165.    Respondent's relationship with its users is governed by the Website's cookie pop-up banner and its Privacy Preferences Window, among other documents.

166.    These governing documents, including the Website's cookie pop-up banner and the Privacy Preferences Window, contain enforceable promises that Respondent made to Claimant and users, including but not limited to the following:

a.  Users of Respondent's Website can either "Accept All" cookies or "Disable All" cookies by selecting or clicking the button associated with each apparent choice,

b.  For those users who select the "Disable All" button, Respondent would not use cookies on the Website or place cookies on users' devices and/or browsers—let alone for "advertising and analytics" purposes—or, at the very least, Respondent would not use or place Performance, Functional, and Targeting cookies, as further clarified or explained in its Privacy Preference Center.

167.  Respondent breached these duties and violated these promises by causing such cookies and software code to be stored on Claimant's devices and browsers that cause the transmission of Claimant's private web activity and Private Communications to third parties and Respondent, even though Respondent promised that Claimant could "Disable All" such cookies, and Claimant, in fact, chose to "Disable All" such cookies.

168.  California law recognizes the implied covenant of good faith and fair dealing in every contract.

169.  In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

170.  Respondent purports to respect and protect its users' privacy.

171.  Despite its contractual promises to allow consumers to "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

172.  Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

173.  Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

174.  Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who rejected or opted out of receiving such cookies, through their express election to "Disable All" such cookies, evaded the spirit of the bargain

made between Respondent and Claimant, since it caused Claimant to surrender more data than Respondent otherwise bargained for.

175.    As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

176.    As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit, and/or Misrepresentation

177.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

178.    Respondent has fraudulently and deceptively informed Claimant that he could "Disable All" cookies on the Website, including at least all  Performance, Functional, and Targeting cookies. In fact, Respondent caused such cookies and software code to be stored on consumers' devices—including Claimant's—even after users chose to "Disable All" such cookies. These cookies and software code caused the transmission of private web activity and Private Communications to third parties and Respondent when consumers visited and/or used the Website, even after consumers rejected or declined the receipt of such cookies.

179.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew, or should have known, how the Website and cookies on the Website functioned, through testing the Website or otherwise, and knew, or should have known, that the Website placed such cookies on users' devices—including Claimant's—even after users chose to "Disable All" such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the

Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

180.    Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

181.    Claimant has suffered an injury-in-fact, including the loss of money and/or property, as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

182.    Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

183.    Respondent's representation that consumers could "Disable All" cookies, including at least all Performance, Functional, and Targeting cookies, and thereby opt out of the sale of their personal information, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookies pop-up banner prior to using the Website. Had Respondent disclosed that it causes such cookies to be stored on consumers' devices, even when they choose to disable "All" such cookies, Claimant would have noticed it and would not have used the Website.

184.    By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and other Website users, to alter their positions to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant to, without limitation, use the Website under the mistaken belief that Respondent would not collect data itself or share users' personal data with third parties through the cookies when consumers chose to disable "All" cookies, including at least all Performance, Functional, and Targeting cookies.

185.    Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

COMPLAINT AND DEMAND FOR ARBITRATION

1    186.    As a direct and proximate result of Respondent's misrepresentations and/or

2    omissions, Claimant has suffered damages, as alleged above.

3    187.    Respondent's conduct, as described herein, was wilful and malicious and was

4    designed to maximize Respondent's profits even though Respondent knew that it would cause

5    loss and harm to Claimant and other Website users.

6

7    ## TWELFTH CAUSE OF ACTION

8    ### Negligent Misrepresentation

9    188.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

10    189.    Respondent represented to Claimant a fact that was not true, namely, that users

11    could "Disable All" cookies on the Website, or at least all Performance, Functional, and

12    Targeting cookies. In truth, Respondent caused such cookies and software code to be stored on

13    consumers' devices and browsers, which caused the transmission of users' private web activity

14    and Private Communications to third parties and Respondent, even after users chose to "Disable

15    All" such cookies.

16    190.    These representations were material at the time they were made. They concerned

17    material facts that were essential to the decisions of Claimant and other Website users regarding

18    whether and/or how to visit and use the Website.

19    191.    Respondent should have known its representations were false, and that it had no

20    reasonable grounds for believing them to be true when it made them.

21    192.    Respondent intended that Claimant and users of the Website rely on Respondent's

22    representations.

23    193.    By and through such negligent misrepresentations, Respondent intended to

24    induce Claimant, and other Website users, to alter their positions to their detriment. Specifically,

25    Respondent negligently induced Claimant, and its Website's users, to without limitation, browse

26    the Website under the mistaken belief that Respondent would not collect data itself or cause the

27    sharing with third parties of the personal data of Website users after they chose to disable "All"

28    cookies, or at least all Performance, Functional, and Targeting cookies.

COMPLAINT AND DEMAND FOR ARBITRATION

194.   Claimant reasonably relied on Respondent's representations.

195.   Claimant was harmed as set forth above.

196.   Claimant's reliance on Respondent's representations was a substantial factor in causing the harm.

### THIRTEENTH CAUSE OF ACTION

### Trespass to Chattels

197.   Claimant realleges and incorporates by reference all paragraphs alleged herein.

198.   At all times relevant, Claimant owned, leased, and/or controlled his devices.

199.   Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Website and use the data collected for their own advantage, as described above.

200.   Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could disable "All" cookies, or at least all Performance, Functional, and Targeting cookies. Respondent further failed to disclose that it causes unwanted third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers chose to "Disable All" such cookies.

201.   Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with Claimant's use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

202.   Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

     a.     Nominal damages for trespass;

     b.     Reduction of storage, disk space, and performance of Claimant's computing devices; and

c.    Loss of value of Claimant's computing devices.

**FOURTEENTH CAUSE OF ACTION**

**Unjust Enrichment**

203.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

204.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

205.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Disable All" cookies on the Website, including at least all Performance, Functional, and Targeting cookies. Respondent further failed to disclose that it causes unwanted third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers disable such cookies.

206.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at Claimant's expense.

207.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

208.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

209.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

210.    Claimant pleads this claim separately, as well as in the alternative, to his other claims, as without such claims he would have no adequate legal remedy.

**PRAYER FOR RELIEF**

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.     An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B.     An order for full restitution;

C.     An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.     An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E.     For reasonable attorneys' fees and the costs of suit incurred; and

F.     For such further relief as may be just and proper.


Dated: July 17, 2024

GUTRIDE SAFIER LLP


*/s/Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
   seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
   marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
   todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
   kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT B



Western Case Management Center
Sophia Parra
Assistant Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

September 24, 2025

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Charles Throckmorton, Esq.
Foley and Lardner
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
Via Email to: charles.throckmorton@foley.com

Case Number: 01-24-0006-5078

Javier Hernandez
-vs-
Foris Dax, Inc.

Dear Parties:

On September 9, 2025, the American Arbitration Association (AAA) reviewed and finalized the billing for this matter and closed this case as withdrawn.

Please note that the AAA WebFile® ECF Guidelines will not apply after the closing of the case. Therefore, any additional submissions from the parties in this matter should be submitted via email to the AAA, with copies sent to all other parties.

Any outstanding balances incurred during the case remain due and payable to the AAA, even after closing the case. Monthly invoices will continue to be issued until the balance is paid. The AAA will process any refund due to a party as soon as possible.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the stated closing date.

Thank you for choosing the AAA to administer your arbitration.

Sincerely,
/s/*Caterina Dellavalle on behalf of*
Christina Negrete
Manager of ADR Services
Direct Dial: (559)475-6265
Email: ChristinaNegrete@adr.org
Fax: (855)433-3046


cc:
Patrick Branson, Esq.
Kali R. Backer, Esq.
Madeleine Wykstra
Marie A. McCrary, Esq.
Samantha Fuhrman
Seth A. Safier, Esq.
Todd Kennedy, Esq.